UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Theodore Wells,
    *Petitioner*,

      *v.*

United States of America,
    *Respondent.*

Civil No. 3:07cv1740 (JBA)

January 22, 2010

RULING ON MOTION TO VACATE,
SET ASIDE, OR CORRECT SENTENCE

Petitioner Theodore Wells moves *pro se*[1] pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his December 1, 2004 sentence of 120 months' incarceration and five years' supervised release. Judge Alan H. Nevas imposed this sentence after Mr. Wells pleaded guilty to a substitute information charging kidnapping in violation of 18 U.S.C. § 1201(a)(1).[2] In his petition, Mr. Wells claims that he received constitutionally ineffective assistance of counsel in connection with: (1) his speedy-trial rights, (2) his counsel's failure to investigate, (3) his guilty plea, (4) his sentencing, and (5) his appeal. For the following reasons, Petitioner's motion will be denied.

I.      Factual and Procedural Background

On October 25, 2002, Mr. Wells, a registered sex offender met a young girl in an Internet chat room. The girl indicated she was thirteen years old, unhappy, depressed, and on medication; she said she had been sexually abused by her father and needed a safe place

---

[1] Because Wells is proceeding *pro se*, the Court construes his claims and arguments using "less stringent standards" than those applied to arguments drafted by lawyers. *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008).

[2] Following Judge Nevas's retirement, this case was transferred to the undersigned.

to stay.  Mr. Wells told her that he had helped other girls and wanted to help her.  He gave her his telephone number and told her to call him.  Later that day, she called and they had a lengthy conversation that lasted between ten and twelve hours.  Mr. Wells misrepresented to her that he was a counselor, convinced her to come and stay at his house, arranged to meet her in Connecticut where she lived, and told her they would travel together to his home in New Jersey.  The next day, Mr. Wells traveled to Connecticut and met the girl at a bus station in Bridgeport.  He bought her a bus ticket using the name of his previous victim.  Mr. Wells told the girl to call him "Daddy" and gave her a jacket to wear as a disguise.  He then transported her by bus and taxi to his home.  They spent the night together.  The next afternoon she cried and told him she was homesick and wanted to leave.  She called her boyfriend and asked for his help.  The boyfriend put his mother on the phone and she told the girl she would come get her.  Mr. Wells then spoke to the woman and said he would accompany the girl to Philadelphia where they could all meet.  They met at the bus station in Philadelphia that night, and the woman drove the girl home to Connecticut.  She told the girl that her parents had filed a missing-person report and that the police were looking for her.  The girl told the woman that Mr. Wells had sexually abused her.  When they got back to Connecticut, they went straight to the police station.  After the police interviewed the girl, she was taken to the hospital for examination.

Mr. Wells was subsequently identified through telephone records.  He was arrested on May 13, 2003.  When the police initially questioned him he admitted that he traveled from New Jersey to Connecticut to meet the girl and transported her to New Jersey.  He also admitted that they slept in the same bed, that they "cuddled," that he may have accidentally touched her buttocks, that he touched her breast and abdomen, and that she touched his

penis, but he denied they engaged in "inappropriate sexual contact." After Mr. Wells was taken into custody, a federal public defender was appointed to represent him. Thereafter, Mr. Wells was charged in a two-count indictment alleging interstate travel to engage in illegal sexual activity with a minor and transporting a minor in interstate commerce in violation of 18 U.S.C. § 2423(a) and (b). In October 2003, a superseding indictment charged him with a third count: enticement of a minor in violation of 18 U.S.C. § 2422(b). Each of these counts carried a statutory maximum sentence of fifteen years' imprisonment.

On November 7, 2003, Mr. Wells's counsel moved for a competency examination and hearing. He represented that he was having increasing difficulty communicating with Mr. Wells and that Mr. Wells seemed disinterested, appeared extremely agitated, and needed medical or psychiatric care. The court ordered a competency evaluation and Mr. Wells was sent to a Bureau of Prisons facility in Los Angeles, California for the evaluation. Because Mr. Wells refused to cooperate, the mental-health professionals were unable to conduct a comprehensive evaluation. Nonetheless, based on observations of his behavior at the facility and the local hospital where he was treated following his refusal to eat, they concluded that his inability or unwillingness to cooperate with his counsel appeared to be volitional rather than the product of a genuine mental illness and that he was competent to stand trial. After Mr. Wells was returned to Connecticut, he was housed in medical and mental-health units due to his inability or refusal to talk or respond to staff and his limited food and fluid intake. Because Mr. Wells's counsel was still unable to communicate with him, he again moved on June 1, 2004, for a second competency evaluation, which the court ordered. Mr. Wells was re-examined on June 10 and June 17, 2004 in New Haven, Connecticut. Mr. Wells was more cooperative during these evaluations, and the doctor was able to conclude that Mr. Wells

understood the events leading to his arrest, the charges against him, and the possible disposition of his case, and that he did not suffer from a mental disease or defect that rendered him incompetent to stand trial.  On July 29, 2004, the court found that Mr. Wells had the ability to consult with counsel with a reasonable degree of rational understanding, would be able to participate in a defense strategy and provide his counsel with pertinent information, and that he was competent to stand trial.

Thereafter, Mr. Wells's counsel engaged in plea negotiations with the government. He was ultimately able to negotiate an agreement that allowed Mr. Wells to plead guilty to a one-count substitute information charging him with kidnapping.  The agreement calculated a sentencing range of 70 to 87 months.  By virtue of the plea agreement, Mr. Wells would avoid the sentencing guidelines recommendation for a "repeat and dangerous sex offender against a minor," U.S.S.G. § 4B1.5, which would have resulted in a sentencing range of 168 to 210 months' imprisonment.  In the plea agreement, both Mr. Wells and the government reserved the right to argue for a departure from the 70-to-87-month guidelines range.  Mr. Wells entered a guilty plea pursuant to the plea agreement on August 25, 2004. At the plea hearing, the court canvassed Mr. Wells with respect to each element of the offense for which he was charged, found his plea valid, and accepted the plea.

In his presentence report ("PSR"), Mr. Wells's sentencing range was calculated to be 70 to 87 months.  The PSR, however, recommended that the court consider an upward departure to reflect the actual seriousness of his offense and his dismissed and uncharged conduct, and because the guidelines calculation exposed Mr. Wells to a substantially lower range than that of a repeat sex offender.  In addition, the PSR reported that, in December 2000, Mr. Wells pleaded guilty in the U.S. District Court for the Southern District of Florida

to traveling in interstate commerce to engage in a sexual act with a minor and was sentenced to one year and one day in jail.[3]  The PSR prepared in the case in Florida disclosed that Mr. Wells had engaged in a pattern of strikingly similar conduct.  Specifically, in late 1999, Mr. Wells met a 15-year-old girl on the Internet; Mr. Wells ultimately convinced her to travel from Illinois to his home in Florida and sent her a bus ticket.  After the victim's parents reported her missing, law-enforcement authorities tracked her to Mr. Wells's home in Florida.  However, because the victim denied that any sexual contact had occurred and instead claimed to be a willing participant, she returned home with her parents and Mr. Wells was not charged with any crime.  Less than a month later, Mr. Wells again contacted the Florida victim through another young girl he met on the Internet, and through that intermediary, he arranged to travel from Florida to meet the girl in Illinois.  They met as planned, went to a motel, and engaged in sexual activities.  The next day, they left Illinois intending to return to Mr. Wells's home in Florida.  They were intercepted in Memphis, Tennessee.  Mr. Wells was arrested and admitted that he had sex with the girl and that he knew she was 15.

The PSR also disclosed that law enforcement authorities found letters and recorded phone messages to Mr. Wells from another 15-year-old girl who lived in Guam.  The FBI interviewed the girl, who reported that she had met Mr. Wells in an Internet chat room for troubled teens and thereafter communicated with him for several months online and also by e-mail, telephone, and mail.  She said she told him she was 15.  He told her that he helped

---

[3] Mr. Wells served approximately ten months of that sentence.  He was also sentenced to three years' supervised release, but after he served only about two years of that term, his supervised release was terminated despite a judicial determination that he had violated the terms of his release.

girls run away from home and offered to send her a plane ticket and to meet her at the airport so they could be together.  Mr. Wells was never charged in connection with that activity.

Mr. Wells was sentenced in this case on December 1, 2004.  At sentencing, the Government moved for an upward departure pursuant to Sections 5K2.21 and 4A1.3 of the Sentencing Guidelines on the grounds that Mr. Wells's criminal-history category under-represented the seriousness of his criminal history based on his previous uncharged criminal conduct with the minors from Illinois and Guam.  Mr. Wells's counsel objected to any upward departure and moved for a downward departure pursuant to Section 5H1.2 based on Mr. Wells's childhood abuse and serious mental- and emotional-health issues.

The court agreed with the government's position and upwardly departed from the guidelines range under both Sections 4A1.3 and 5K2.21 on the grounds that reliable information showed that Mr. Wells's criminal history substantially under-represented the seriousness of his previous conduct and the likelihood of recidivism, neither of which were taken into account in the guidelines calculation.  The court stated that it believed Mr. Wells was a repeat sex offender, had two prior incidents with minors that were uncharged, and had received extreme leniency in connection with his prior conviction in December 2000.  The court also noted that Mr. Wells committed the offense at issue while he was still on supervised release for the 2000 conviction and less than two years after he was released from incarceration.  Based on those findings, the court sentenced Mr. Wells to 120 months' imprisonment and five years' supervised release, and imposed a special supervised release condition that restricted and monitored his use of computers and the Internet.

Mr. Wells appealed his sentence.  The government moved to stay the appeal and for

6

a limited remand to determine whether re-sentencing was necessary after *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). On remand, the court noted that a major factor in its sentence was that Mr. Wells had been treated too leniently in the past and that, under Second Circuit law, the inadequacy of his criminal-history category was an encouraged basis for an upward departure. The court concluded that the original 120-month sentence was fair, adequate, and appropriate under either a guidelines or a non-guidelines sentence when considering all of the 18 U.S.C. § 3553 factors, and the court determined that it would not have imposed a materially different sentence if the guidelines had been merely advisory.

After remand, Mr. Wells filed an appeal arguing that the court abused its discretion when it departed upward pursuant to § 5K2.21 and § 4A1.3 of the Guidelines. The Second Circuit rejected his claims of error, noting that two prior similar incidents supported the § 4A1.3 departure, that Mr. Wells's entire record illustrated "dogged criminal persistence to entice, entrap, and sexually abuse minors, only one of which was reflected in his criminal history category," and that the court "properly considered the leniency of his prior punishment in assessing his potential to recidivate." *United States v. Wells*, No. 05-5810-cr, 2006 WL 2522007, at *1 (2d Cir. Aug. 30, 2006). Because the appellate court found that the district court did not exceed its discretion in departing upward pursuant to § 4A1.3, it declined to address Mr. Wells's argument that the departure was not proper pursuant to § 5K2.21. *Id.* at *3.

Mr. Wells then timely filed his petition pursuant to 28 U.S.C. § 2255, alleging ineffective assistance of counsel. As noted above, Mr. Wells contends that his representation was constitutionally deficient because counsel (1) failed to move to dismiss the indictment

on speedy-trial grounds, (2) failed to conduct an investigation, (3) allowed him to plead guilty to a crime for which there was an inadequate factual basis, (4) made numerous errors in connection with his sentencing, and (5) failed to make meritorious arguments on appeal. As explained below, the Court finds that Mr. Wells has failed to meet his burden of proving that the conduct of his counsel fell below the wide range of reasonable professional assistance.

## II.     Standard of Review

A claim of ineffective assistance of counsel is assessed under the two-pronged standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984).  The first prong considers whether counsel's performance was objectively unreasonable "under prevailing professional norms."  *Id.* at 688.  To satisfy this element, an error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  Second, the petitioner must affirmatively prove prejudice by showing that counsel's errors were so serious that they "deprive[d] the defendant of a fair trial" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 687, 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Put another way, an error by counsel does not warrant setting aside a conviction unless it had an "effect on the judgment."  *Id.* at 692.

"Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  An attorney's performance should not be viewed through the lens of hindsight, but rather assessed by "consider[ing] the

8

circumstances counsel faced at the time" of the proceedings and through "counsel's point of view." *Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir. 2005). Counsel's "strategic choices . . . are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A habeas petitioner will not prevail on an ineffective assistance claim by second-guessing or disagreeing with counsel's strategy. *Id.* at 689. A constitutionally inadequate performance may be established by a "show[ing] that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," keeping in mind that "counsel does not have a duty to advance every nonfrivolous argument that could be made." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

In connection with a guilty plea, an attorney's representation is deemed to have been effective so long as he or she "communicated to the defendant the terms of the plea offer," "informed [the defendant] of the strengths and weaknesses" of the prosecution's case, and provide[d] [the defendant] with an "informed opinion" on "whether a particular plea appears to be desirable." *Purdy v. United States*, 208 F.3d 41, 45–48 (2d Cir. 2000). To establish prejudice where the defendant pleaded guilty, the habeas petitioner must show that, but for counsel's deficient representation, the petitioner "would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). This presents a "formidable barrier" in cases where the petitioner has attested under oath and in open court that he or she understood the consequences of the decision to plead guilty and had read and signed a written plea agreement. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *United States v. Hernandez*, 242 F.3d 110, 112–13 (2d Cir. 2001).

III.    Discussion

    A.    Speedy-Trial Rights

Mr. Wells first claims that his attorney's performance was deficient because he advised him to plead guilty rather than move to dismiss the indictment based on the Speedy Trial Act, 18 U.S.C. §§ 3161–3174, and Sixth Amendment violations.

    1.    *Speedy Trial Act*

Even assuming *arguendo* that Mr. Wells has established a violation of his rights under the Speedy Trial Act with regard to counts one and two of the indictment, the facts and circumstances in the record do not establish that "counsel's performance was unreasonable under prevailing professional norms," *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986), because Mr. Wells has not shown that the advice he received from counsel in this regard was objectively unreasonable based on acceptable standards.

To the contrary, counsel's advice to Mr. Wells to accept the favorable plea agreement rather than move to dismiss the indictment was a reasonable strategic decision based on a justifiable conclusion that even if the motion were granted, it would likely be granted without prejudice to re-prosecution because there were no factors that favored a with-prejudice dismissal. *See* 18 U.S.C. § 3162(a)(2) (setting forth factors to consider in determining whether a dismissal should be with or without prejudice); *United States v. Taylor*, 487 U.S. 326, 334 (1988) (observing that more than an isolated unwitting violation of speedy-trial rights by the government is necessary to justify dismissal with prejudice); *United States v. Wilson*, 11 F.3d 346, 352 (2d Cir. 1993) (applying factors).

Specifically, the offenses with which Mr. Wells was charged were serious. Thus, dismissal with prejudice would only be warranted if there had been serious delay. *United*

*States v. Simmons*, 786 F.2d 479, 485 (2d Cir. 1986); *United States v. Mancuso*, 302 F. Supp. 2d 23, 27 (E.D.N.Y. 2004). The delay here was not severe.[4]  There was no evidence of bad faith or a pattern of neglect, or other serious misconduct on the part of the government. *United States v. Mr. Wells*, 893 F.2d 535, 539–40 (2d Cir. 1990) ("[T]o dismiss an indictment with prejudice for a violation of the Speedy Trial Act, the court should specifically describe the government's conduct and find that conduct to be more than an isolated, unwitting violation."); *United States v. Hernandez*, 863 F.2d 239, 244 (2d Cir. 1988) (same).  And there was no evidence that Mr. Wells was prejudiced by the delay other than by "the ongoing uncertainty inherent in facing pending criminal charges."  *See United States v. Mora*, No.

---

[4] This does not mean that the court accepts any of Mr. Wells's various Speedy Trial Act calculations, especially because he does not exclude the time from Nov. 6, 2003, the date his counsel made an oral motion for a competency evaluation, to August 2, 2004, the date the court found him competent to stand trial [Doc. # 35].  There can be no dispute that all of this time is properly excluded under 18 U.S.C. § 3161(h)(1)(A), which excludes any delay resulting from proceedings, including examinations, to determine mental competency without regard to whether or not the delay is reasonable.  *United States v. Vasquez*, 918 F.2d 329, 333 (2d Cir. 1990).  Not counting this time, a total of 159 days elapsed from May 29, 2003, the date the speedy trial clock began to run, to August 25, 2004, the date Mr. Wells entered a guilty plea.

Further, even if *Zedner v. United States*, 547 U.S. 489 (2006), requires the Court to now include all the days previously excluded based on the presumed validity of Mr. Wells's prospective speedy trial waivers, as well as the days the court excluded based on ends-of-justice continuances, there are a total of 36 days that are properly excludable under the speedy-trial calculation.  Twenty-nine days are excludable under Section 3161(h)(1)(H) of the Act, which excludes delays during which a motion is under advisement by the court: five days passed during which the Court considered Mr. Wells' first motion to continue jury selection [Doc. # 10]; twelve days passed after Mr. Wells filed another motion to postpone jury selection [Doc. # 13] before an order was issued; and a further twelve days passed, while the Court considered his last motion to continue jury selection [Doc. # 36].  Seven additional days between the filing of the superseding indictment and the date of arraignment, Oct. 30 to Nov. 6, 2003, are excludable.  Subtracting these 36 days and the 70 days allowed by the Speedy Trial Act, there were, at most, 53 non-excludable days of delay.

1:04cr530(LAP), 2005 WL 1354042, at *6 (S.D.N.Y. June 7, 2005) (such delay not prejudicial).[5]

For these reasons, even accepting Mr. Wells's argument that there was in fact a speedy-trial violation, a reasonably competent attorney would have concluded that the court would have simply dismissed the indictment without prejudice to re-prosecution. Because the Government would have been free to seek a new indictment based on the same conduct and the same charges, *see, e.g.*, *United States v. Reyes*, No. 1:07cv1614(JG), 2007 WL 2973591, at *5 (S.D.N.Y. Oct. 10, 2007), Mr. Wells would have accrued no benefit from a speedy-trial dismissal of the indictment.

Another reason why counsel's advice was reasonable is that only the first and second counts of the indictment were impacted by the Speedy Trial Act delay. The third count,[6] charging enticement of a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b), which was added by the October 30, 2003 superseding indictment, was not subject to dismissal under Section 3161(a)(1) because it required proof of an element distinct from, or in addition to, the elements of the offenses in counts one and two. *See United States v. Gaskin*, 364 F.3d 438, 452–55 (2d Cir. 2004). Although though this offense arose from the same criminal episode as counts one and two, which charged traveling to engage in sexual activity with a minor and transporting a minor to engage in sexual activity in violation of 18 U.S.C. § 2423(a) and (b), count three was distinct because it required proof of the additional

---

[5] The respective statutes of limitations for the three offenses with which Mr. Wells was charged were not implicated.

[6] Counts one and two of the original indictment were re-alleged as counts one and two of the superseding indictment.

element of enticement.

Accordingly, the speedy-trial clock for count three began to run on November 6, 2003, the date Mr. Wells was arraigned on the superseding indictment, but it was immediately tolled until August 2, 2004 by virtue of the motion to determine competency. By the date of Mr. Wells's guilty plea, only 11 days had run on the clock,[7] and count three would have remained a viable charge even if counts one and two were dismissed with prejudice.  Moreover, the statutory maximum sentence was the same for all three counts, *compare* 18 U.S.C. §§ 2422(b), 2423(a) and (b), and dismissal of counts one and two would have had no effect on Mr. Wells's classification as a repeat sexual offender under the Sentencing Guidelines.  *See* U.S.S.G. § 4B1.5 app note 3 (2001).  Given these facts, reasonably competent counsel would have advised against moving to dismiss the indictment as being a futile gesture.

### 2.    *Sixth Amendment Right to a Speedy Trial*

Mr. Wells's claim regarding his constitutional right to speedy is similarly without merit because it was objectively reasonable for counsel to believe that such a claim would have failed as well.  To determine the merits of a claim based on a violation of the Sixth Amendment right to a speedy trial, the court balances the length of the delay, the reason for the delay, the defendant's assertion of his rights, and prejudice to the defendant.  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).  Assuming the delay of approximately fifteen months between Mr. Wells's arrest and guilty plea is substantial enough to trigger the *Barker v.*

---

[7] The clock was tolled for twelve days, from August 13 to August 24, 2004.

*Wingo* analysis, *see id.* (noting that the other three factors are brought into play only if the delay is substantial enough to be presumptively prejudicial), the inquiry demonstrates that there was violation of his constitutional rights.

First, almost nine months of the delay was caused by the competency-evaluation process, and that time is largely attributable to Mr. Wells's refusal to cooperate.  When Mr. Wells was sent to a medical facility for evaluation, he refused to talk and participate in the process, instead spending most of his time reading and sleeping.  Because he refused to eat, he was hospitalized on one occasion and intermittently placed on lock-down status for close monitoring.  The staff eventually concluded, based on their observations, that his behavior was manipulative, volitional, and controlling.  But because Mr. Wells refused to cooperate, the staff were unable to complete a sufficiently comprehensive evaluation or reach a definite conclusion as to his competency.  When Mr. Wells was returned to Connecticut, he was housed in a mental-health unit, remained nonverbal and non-responsive, and limited his food and fluid intake to the extent that he was hospitalized twice for dehydration.  This behavior caused counsel to request a second competency evaluation.  Although Mr. Wells was more cooperative the second time around, he initially claimed to have no memory of the events leading to his arrest, and would only speak through "a voice in his head."  He eventually regained his memory and cooperated sufficiently so that the examiner was able to conclude that he did not suffer from a mental disease or defect that rendered him unable to assist in his defense or to understand the nature and consequences of the proceedings against him.  Thus, the bulk of the delay in Mr. Wells's prosecution is attributable to his own conduct.

14

Three other factors also weigh against Mr. Wells's Sixth Amendment claim. First, as explained above, Mr. Wells has failed to show prejudice because the Government could simply re-prosecute him. Second, there is no evidence that the Government intentionally or negligently caused any delay. And third, Mr. Wells has failed to show how the delay impaired his ability to mount a defense. These factors all weigh against Mr. Wells, fail to show a meritorious Sixth Amendment claim, and thus provide no basis on which to find his counsel's assistance ineffective for determining not to raise such a claim. The Court finds that Mr. Wells's right to a speedy trial under the Sixth Amendment was not violated by the delay between his arrest and guilty plea.

### 3.    Conclusion

In sum, counsel's performance with regard to Mr. Wells's statutory and constitutional speedy-trial rights was not ineffective.

### B.    Failure to Investigate

Next, Mr. Wells contends that counsel was ineffective in advising him to plead guilty without conducting an investigation, and thus claims that his guilty plea was not knowing and intelligent.[8] According to Mr. Wells, if counsel had conducted an investigation of the victim, he might have obtained evidence showing that she lied, was mentally disturbed, manipulative, and had told three different stories about their encounter, and this

---

[8] Because this claim is couched in a way that ostensibly implicates the voluntary and intelligent nature of his guilty plea and the advice he received from counsel, it survives his guilty plea for purposes of habeas corpus review. *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973).

information should have caused counsel to advise Mr. Wells that he had a "good chance" at trial. If counsel had given him such advice, Mr. Wells says he would have insisted on going to trial.

Putting aside the fact that this argument is, in essence, not about the scope of counsel's investigation, but rather "a complaint about strategy cast in investigatory terms," *see Greiner v. Wells*, 417 F.3d 305, 322 (2d Cir. 2005) (where petitioner's "failure-to-investigate" and "failure-to-introduce evidence" arguments are identical, they implicate trial strategy), and even assuming, *arguendo*, that counsel acted unreasonably by not undertaking an investigation, Mr. Wells has failed to demonstrate that the investigation he describes would have uncovered sufficient exculpatory or favorable evidence that would have caused competent counsel to recommend against pleading guilty to kidnapping and go to trial on the three-count indictment.

Where, as here, the error alleged by a petitioner is "a failure to investigate or discover potentially exculpatory evidence, the determination whether the error prejudiced the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). In turn, this analysis "will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Id.* "Courts must grant considerable deference to defense counsel, who may limit their investigations depending on the evidence already available and interactions with their clients in exercising strategic judgments." *Strickland*, 466 U.S. at 690–91. The failure to investigate can constitute ineffective assistance only when the decision was not supported by reasonable professional judgment. *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990). Counsel

16

has no obligation to investigate every line of defense a defendant suggests; instead, counsel is only required to make a reasonable decision about whether to investigate a particular line of defense based on the overall defense strategy. *See, e.g.*, *Curry v. Burge*, No. 1:03cv901(LAK)(AJP), 2007 WL 3097165, at *16 (S.D.N.Y. Oct. 23, 2007) (ineffective assistance of counsel claims denied where attorney decided not to have witnesses testify because of his judgment that their testimony would have been more harmful than helpful).

Mr. Wells's speculation as to the evidence an investigation would have uncovered is insufficient to show that professional incompetence rather than reasonable professional judgment caused counsel to recommend the guilty plea. Indeed, none of the evidence Mr. Wells thinks an investigation might have discovered would likely make "a lawyer optimistic about taking the case to trial" or would likely alter the outcome of a trial. *United States v. Patasnik*, 89 F.3d 63, 68 (2d Cir. 1996) (petitioner's conclusory statements about counsel's failure to investigate did not undermine the reasonableness of counsel's recommendation). Not only has Mr. Wells failed to offer more than his speculation to support his claim that he was prejudiced by counsel's failure to conduct the investigation he describes, but he has also failed to show how any evidence that may have been discovered would have been either exculpatory or admissible at trial. *Cf. Croney v. Scully*, No. 1:86cv4335, 1988 WL 69766, at*1–2 (E.D.N.Y. Jun. 13, 1988) (noting that courts are particularly skeptical when reviewing a petitioner's bare assertion that a witness would have testified in a particular way).

For instance, Mr. Wells speculates that had counsel interviewed the victim's family, friends, neighbors, teachers, school personnel, mental health providers, and caregivers, he might have discovered that she was mentally disturbed, pathologically dishonest to the extent she could not distinguish fact from fiction, had made prior false accusations of sexual

assault, and had lied about minor details of their encounter.  Even assuming those individuals would have provided this type of impeachment evidence, Mr. Wells does not show that any of these individuals would have been available to testify at trial, that the basis of their testimony would show it to be admissible, or how their testimony would have helped his defense.  Further, assuming an investigation may have provided counsel with the required good-faith basis to ask the victim about her purported false accusations of sexual abuse by her father, it is unlikely that the trial court would have permitted extrinsic evidence, assuming it existed, if she denied that she had made such false accusations.  *See United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003) (finding no abuse of discretion where court excluded both extrinsic evidence and cross examination relating to alleged instances of the victim's prior false accusations of sexual abuse); *United States v. Griffith*, 284 F.3d 338, 352 (2d Cir. 2002) (same).  Moreover, while evidence of the victim's psychological history might be probative of her credibility, trial courts have broad discretion in determining the admissibility of such evidence and must carefully weigh its probative value by considering the nature of the alleged psychological problem, the temporal recency or remoteness of the history, whether she suffered from the problem at the time of the events at issue, and whether her problems were likely to have affected her ability to perceive, recall events, or testify accurately.  *See Crowley*, 318 F.3d at 419.  Thus, it is far from certain that evidence of the victim's alleged mental instability would have been admissible at trial.

At best, the evidence that Mr. Wells speculates an investigation of the victim might have uncovered would have been useful for impeachment, but it was not exculpatory.  This is also true with regard to the evidence he says would have been uncovered if counsel had investigated his uncharged conduct with other minors that was identified in the PSR.

Accordingly, the investigation Mr. Wells outlines would not likely have caused counsel to change his recommendation that Mr. Wells accept the favorable plea agreement.  To the contrary, based on the government's strong case against Mr. Wells, none of this purported evidence would have likely caused competent counsel to advise going to trial, especially in light of the fact that Mr. Wells had admitted having sexual contact with the victim and that his prior conviction and prior uncharged conduct with other minors might well have been admitted at trial to prove propensity, intent, motive, plan, and knowledge.  *See United States v. Brand*, 467 F.3d 179, 197 (2d Cir. 2006) ("We have long acknowledged that prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." (internal quotation omitted)).

C.     Advice to Plead Guilty to an Offense for Which There Was an Inadequate Factual Basis

Mr. Wells pleaded guilty to a one-count substitute information alleging that he unlawfully kidnaped, inveigled, and through decoy, took and held a minor person for the purpose of ransom, reward, or otherwise, and willfully transported the minor in interstate commerce from Connecticut to New Jersey in violation of 18 U.S.C. § 1201(a)(1).[9]  Mr. Wells now argues that counsel was ineffective for not fully explaining to him the elements of this offense and for failing to ensure there was an adequate factual basis for him to plead to this offense.  He claims he was prejudiced because the court would not have accepted his

---

[9] The elements of kidnapping under § 1201(a)(1) are (1) unlawful seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away; (2) holding, for ransom, reward, or otherwise, (3) and willful transporting in interstate commerce.  Seizing, confining, kidnapping, abducting, and carrying away involve a physical taking, whereas inveigling and decoying involve a non-physical taking.  *United States v. Macklin*, 671 F.2d 60, 66 (2d Cir. 1982).

guilty plea if it had known the plea was without an adequate factual basis and that Mr. Wells did not understand the nature of the charges.  This claim fails for numerous reasons.

First, there is no merit to Mr. Wells's claim that there was no factual basis for the unlawful-inveigling element of this offense because he did not use force and the Government did not allege that he used force.  Contrary to Mr. Wells's assertion, force is not a necessary element of kidnapping.  Where, as here, the defendant is charged with inveigling, all that is required is a non-physical taking by which the kidnapper, through deception or some other means, lures the victim into accompanying him.  *United States v. Macklin*, 671 F.2d at 66 (defining inveigling as "enticing, cajoling, or tempting the victim, usually through some deceitful means such as false promises"); *see also Yushuvayev v. United States*, 532 F. Supp. 2d 455, 474 (E.D.N.Y. 2008) (holding that the use of physical force is immaterial under Section 1201(a) where defendant is charged with inveigling or decoying the victim to accompany him by false pretenses).  It is well established that the statute criminalizes kidnapping accomplished through physical, forcible means as well as through nonphysical, nonforcible means.  *United States v. Wills*, 234 F.3d 174, 177 (4th Cir. 2000) (holding that the statute applies to kidnapping accomplished solely by seduction of the victim).

Second, similarly baseless is Mr. Wells's assertion that there was no factual basis for the "holding" element because the victim, by implication from the facts, must have felt perfectly free to leave.  A "holding" under § 1201(a)(1) implies an intent to restrain the victim's movements contrary to her wishes.  *Chatwin v. United States*, 326 U.S. 455, 460 (1946).  In other words, a victim is "held" or detained when the defendant transports her without her consent. *See United States v. McGrady*, 191 F.2d 829 (7th Cir. 1951) (noting that the holding element of the statute can be achieved by mental as well as physical means);

*United States v. Lewis*, 662 F.2d 1087, 1088 (4th Cir. 1981); *United States v. McBryar*, 553 F.2d 433, 434 (5th Cir. 1977).  Where, as here, kidnapping is accomplished by inveigling, the "holding" is implicit in the kidnapping and transporting, since inveigling necessarily contemplates that the victim's apparent consent was in fact obtained by deception.  *Cf. United States v. Sanford*, 169 F.2d 71, 72 (8th Cir. 1948) (inveigling victim to eventually rob him implied that he had not given consent, although it appeared he had); *United States v. Boone*, 959 F.2d 1550, 1557 (11th Cir. 1992) (noting that an inveigled person cannot validly consent to be transported because the willingness to be transported is the result of the defendant's deception).

When Mr. Wells admitted under oath at his plea hearing that he inveigled and transported the minor victim across state lines for the purpose of his own sexual gratification, he thereby admitted the essential elements of kidnapping under § 1201(a)(1). As the Supreme Court noted in *Chatwin*, involuntary or non-consensual "seizure" accomplished through inveigling and involuntary or non-consensual "detention" accomplished through transporting or carrying away are the very essence of the crime of kidnapping.  326 U.S. at 464.

Third, Federal Rule of Criminal Procedure Rule 11—which requires that the district court "(1) determine that defendant understands the nature of the charge to which a plea is offered; and (2) make an inquiry to satisfy the court that a factual basis exists for the plea," has not been violated.  *United States v. Andrades*, 169 F.3d 131, 134 (2d Cir. 1999); *see also United States v. Maher*, 108 F.3d 1513, 1524-25 (2d Cir. 1997)—has not been violated.  An inmate can successfully challenge a guilty plea conviction under Rule 11 only if he "demonstrate[s] that he was prejudiced by the violation because he did not understand the

consequences of his plea, or that, if he had been properly advised, he would not have pled guilty." *Lucas v. United States*, 963 F.2d 8, 13 (2d Cir. 1992). Mr. Wells alleges that his counsel did not detail the charges to him and that he did not understand the law in relation to the facts.

In contrast to his claim that Mr. Belsky did not adequately detail the charges against him, Mr. Wells swore under oath at his plea hearing that he had consulted with his counsel about the charges against and understood them. Mr. Wells's assertion that he had discussed the charges and understood their meaning was sufficient for the plea to meet Rule 11's requirements. *See Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) (guilty plea was valid where attorneys represented on the record that they had explained to their client the elements of the charges against him, followed by their client's confirmation that their representation was true). Moreover, at Mr. Wells's plea hearing the Government both outlined the extensive evidence against him and explained the elements of the crime, including the fact that deception or induced misrepresentation as to the defendant's intent nullifies the victim's consent to transportation and holding. Further, the court read the indictment aloud to him, and in response to the court's canvas as to his understanding of the elements of the offense, Mr. Wells acknowledged that he made untrue representations to the victim in order to induce her to come to his house, that he did so to satisfy a plan or need of his own rather than to counsel or treat her, and that he transported her from Connecticut to New Jersey knowing it was against the law. Nothing more was required to ensure that Mr. Wells's guilty plea was knowing and voluntary and was supported by an adequate factual basis. *Maher*, 108 F.3d at 1524–25 (noting that a district court may rely on defendant's statements and the government's proffer in establishing a factual basis for a guilty plea). Mr. Wells has thus

failed to demonstrate that he was not properly advised of the elements of his crime and that had he been advised differently, he would not have pleaded guilty.  Moreover, Mr. Wells ignores the fact that he received significant benefits from the plea agreement his counsel negotiated, which avoided trial on more serious charges that raised the risk that he would be adjudicated a repeat sex offender, and this would be subject to a guideline sentencing range of 168–210 months.

Because there was no lack of a factual basis to support Mr. Wells's guilty plea to kidnapping in violation of 18 U.S.C. § 1201(a)(1), and because Mr. Wells has failed to establish prejudice, his claim of ineffective assistance of counsel in this regard is without merit.

> D.   Alleged Errors at Sentencing

As explained above, the PSR calculated Mr. Wells's Guideline sentencing range to be 70–87 months but recommended an upward departure to reflect the actual seriousness of his conduct perpetrated against a minor and because the stipulated guideline calculation exposed him to a substantially lower range than that applicable to a repeat sex offender.  At sentencing, the government moved for an upward departure under U.S.S.G. §§ 5K2.21, 4A1.2, and Mr. Wells's counsel opposed and argued for a downward departure under Section 5H1.2, based on childhood abuse and his mental and emotional condition.  After hearing counsels' arguments, the court upwardly departed under both Sections 5K2.21 and 4A1.3, and imposed a sentence of 120 months followed by five years supervised release.  On *Crosby* remand the court found that the original sentence would have been appropriate if the guidelines were advisory and reimposed the same sentence.  On appeal from the *Crosby* remand, the Second Circuit upheld the sentence and the upward departure under § 4A1.2.

Mr. Wells now asserts that his counsel made numerous errors at sentencing which rendered his performance ineffective.  Specifically, he asserts that counsel erred by failing to (1) challenge factual inaccuracies in the PSR regarding his personal history, the uncharged conduct with other minors, and the victim's claim of sexual assault;[10] (2) challenge the court's conclusion that he received leniency in connection with his 2000 sentence for traveling in interstate commerce to engage in a sexual act with a minor,[11] (3) assert meritorious grounds for a downward departure;[12] and (4) challenge the restrictions on his computer and internet use, which the court imposed as a condition of his supervised

_____

[10] According to Mr. Wells, if counsel had investigated his background and history he would have learned that he never used the internet for a criminal purpose, but only to help people, that he had a history of charitable acts; that he had a good relationship with his brother; that he suffered more sexual abuse than reported; that he spent more time in juvenile detention than reported; that the dates of his suicide attempts were wrong; that he was incorrectly diagnosed with paraphilia, a disorder manifesting itself in sexual impulsiveness; and that he was not accurately portrayed in the PSR.  He also claims that if counsel had investigated the two instances of uncharged conduct identified in the PSR, he would have learned that he met the Illinois minor by accident on the internet and that he only visited internet chat rooms to help young girls.  He maintains that this information would have enabled counsel to challenge the government's claim that he had a pattern of predatory behavior.  Mr. Wells further says that if counsel had investigated his encounter with the Guam minor he would have discovered that there were no telephone records to support her claims about their telephone conversations and that he was in jail when some of the alleged telephone conversations occurred.  Mr. Wells additionally contends that an investigation would prove that he tried to help that girl by finding a shelter for her, but that she refused to go, and this would show his pattern of helping young girls.

[11] According to Mr. Wells, he did not receive leniency in connection with his sentence for the 2000 conviction.

[12] Mr. Wells maintains that counsel should have argued for a downward departure based on his physical condition, diminished capacity, rehabilitation, harsh conditions of confinement, and history of charitable service.

release.[13]  He also claims that counsel made numerous errors in his Sentencing Guideline calculations.

Even if Mr. Wells's claims of error had merit and were supported by more than his unsubstantiated assertions, the court would not be required to determine whether they rendered counsel's performance deficient because Mr. Wells does not show that, but for such errors, there is a reasonable probability that his sentence would have been different. *See Strickland*, 466 U.S. at 697.  Moreover, Mr. Wells's claims of error all relate to strategic, discretionary decisions as to which arguments would be the most effective in opposing the government's motion for an upward departure and persuading the court to grant a downward departure, and it is not the Court's role to second guess those decisions.

As the court's remarks at sentencing show, there were numerous reasons why it believed a sentence even at the top of Mr. Wells's Guideline range was inadequate.  First, based on reasonably reliable information in the PSR, the court found that Mr. Wells was a repeat sexual offender and that, but for the dismissed counts, he would have been classified as such pursuant to Section 4B1.5, and that would have resulted in a Criminal History Category level V.  The court also found that the reasonably reliable information in the PSR indicated that Mr. Wells had engaged in prior similar criminal conduct with other minors that did not result in a criminal charge or punishment—specifically, the first of the two incidents with the Illinois minor and the incident with the minor from Guam.  Further, the court believed that Mr. Wells had received extreme leniency in connection with his 2000

---

[13] Mr. Wells characterizes this as an occupational restriction based on his claim that he was a computer programer.  There is no evidence, however, that this was Mr. Wells's occupation or that he had been employed at any time since 1999.

conviction and sentence for the second incident with the Illinois minor. Not only did the court consider the one year and one day term of imprisonment to be inadequate, it was astonished by the fact that his three-year term of supervised release was terminated one year early, despite the fact that he had violated the terms of his release. Finally, the court noted that Mr. Wells had committed the instant offense while he was on supervised release from the 2000 conviction. For these reasons, the court concluded that the PSR's calculation of his Criminal History Category at level III substantially under-represented the seriousness of his criminal history and the likelihood that he would commit other similar crimes in the future. The court reiterated this finding on *Crosby* remand, when it again concluded that these reasons supported the same sentence regardless of whether the Guidelines were mandatory or advisory. The sentence was affirmed by the Second Circuit, which held that the upward departure under Section 4A1.3 was supported by the two prior incidents involving the minors from Illinois and Guam, neither of which resulted in charges or punishment, as well as the fact that Mr. Wells's entire record taken as a whole demonstrated "dogged criminal persistence" to entice, entrap, and sexually abuse minors, and that it was proper for the court to considered the leniency of Mr. Wells's prior punishment in assessing his potential to recidivate. *Wells*, 2006 WL 2522007, at * 1. The Second Circuit found that the district court did not err in departing upward pursuant to Section 4A1.3, and thus it did not address Mr. Wells's arguments that the departure was not proper under Section 5K2.21 or that *ex post facto* principles barred the court from imposing an identical non-Guideline sentence.

Because the district court made it clear that it found the sentencing range of 70–87 months to be substantially inadequate under the circumstances and thus departed upward, *a fortiori*, there is no reason to believe that the court would have imposed a lower sentence

if counsel had not made the alleged errors that Mr. Wells asserts in support of his ineffective assistance claim. *See United States v. Habbas*, 527 F.3d 266, 273–74 (2d Cir. 2008) (because the district court reasonably believed that the sentencing range produced by the Guidelines was inadequate for the crime, counsel's failure to object to a four-level upward adjustment recommended by the PSR was irrelevant, as the defendant suffered no prejudice). In sum, the alleged errors of counsel made no difference to the sentence the court imposed and thus Mr. Wells suffered no prejudice. *See id.*

> D.   Ineffective Assistance of Appellate Counsel

Mr. Wells further claims that he received ineffective counsel in regard to his appeal. The *Strickland* standard applies to appellate as well as trial counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Cuoco v. United States*, 208 F.3d 27, 30–31 (2d Cir. 2000). Because the Court has determined that none of the alleged errors of Mr. Wells's trial counsel constituted ineffective assistance and that Mr. Wells did not suffer any prejudice, Mr. Wells cannot establish that appellate counsel was ineffective for not raising those issues on appeal. *See Castro v. Ward*, 138 F.3d 810, 832 (10th Cir. 1998) ("Because we have held that the substance of the issues involved have no merit, appellate counsel was not ineffective, and [defendant] suffered no prejudice, from his appellate counsel's failure to raise them."). Accordingly, Mr. Wells's claim that his appellate counsel was ineffective is unavailing.

> E.   Evidentiary Hearing

As a final matter, Mr. Wells moves for an evidentiary hearing on his § 2255 petition. An evidentiary hearing is not required, however, where the record, taken together with the moving papers and any exhibits or affidavits submitted, plainly demonstrates that the moving party is not entitled to relief and the court concludes that the petitioner's claims are

truly without merit.  *United States v. Aiello*, 900 F.2d 528, 534 (2d Cir. 1990); 28 U.S.C. § 2255(b).  In light of the foregoing discussion, because it plainly appears from the Court's examination of the record and the moving and opposing briefs that Mr. Wells's petition lacks any meritorious claim, no evidentiary hearing is necessary under these circumstances.

IV.     Conclusion

Accordingly, Petitioner's Motions to Vacate, Set Aside, or Correct Sentence, for relief pursuant to 28 U.S.C. § 2255 [Doc. ## 1, 9] as well as his other motions raising essentially identical issues [Doc. ## 3, 20, 42, 45, 46] are DENIED.  In addition, in light of his failure to demonstrate any likelihood of success on the merits, Petitioner's Motion for Preliminary Injunction [Doc. # 36] is DENIED.  *See Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999).  Petitioner's Motion for Release Pending Decision [Doc. # 49] and Motion to Expedite Ruling on the Motion for Release [Doc. # 50] are DENIED AS MOOT.  Finally, because Mr. Wells has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c)(2).

The Clerk is directed to close this case.


                                IT IS SO ORDERED.


                                   /s/
                                Janet Bond Arterton, U.S.D.J.


          Dated at New Haven, Connecticut this 22nd day of January, 2010.


28